UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  07/18/2022
```

---------------------------------------------------------------------X
                                       :

MATTEL, INC.,                           :

                    Plaintiff,       :

                                     :           21-cv-9608 (LJL)

          -v-                    :

                                     :        OPINION AND ORDER

WWW.FISHER-PRICE.ONLINE,      :

                                   :

                    Defendant.     :

                                   :
---------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

    Plaintiff Mattel, Inc. ("Plaintiff") moves for default judgment pursuant to Federal Rule of Civil Procedure 55(b)(2) and for a permanent injunction pursuant to Federal Rule of Civil Procedure 65.  Dkt. No. 28.

    For the following reasons, the motion for default judgment is granted, and the motion for a permanent injunction is granted in part and denied in part.

## BACKGROUND

    Plaintiff is a leading designer, developer, marketer, manufacturer, and distributor of children's toys and games.  Dkt. No. 1 ("Compl.") ¶ 7.  Since its founding in 1945, Plaintiff has advertised and sold its products under numerous well-known sub-brands such as Barbie, UNO, Thomas & Friends, Hot Wheels, Power Wheels, American Girl, and Fisher-Price.  *Id.*  Incorporated in Delaware, Plaintiff distributes its products worldwide through major retailers, toy stores, and online marketplaces such as Wal-Mart, Target Stores, Walgreens, and Amazon.  *Id.* ¶¶ 5, 9.

    One of Plaintiff's most popular products is Power Wheels, a battery-powered ride-on vehicle for toddlers and preschoolers.  Plaintiff advertises and sells Power Wheels through its

wholly owned subsidiary, Fisher-Price.  *Id*. ¶ 12.  To protect its intellectual property rights in the Power Wheels products, Plaintiff owns Power Wheels and Fisher-Price trademarks for a variety of goods.  *Id*. ¶ 18, Ex. B.  Plaintiff also owns a Fisher-Price trademark for online advertising and ordering services regarding the sale of toys, games, and other related products.  *Id*.  Plaintiff attributes its business success to its high-quality production of Power Wheels products and advertising and promotional efforts through its website, www.fisher-price.com.  *Id*. ¶ 12.

Defendant www.fisher-price.online ("Defendant") is an individual and/or business believed to be located in China.  *Id.* ¶ 6.  Prior to and contemporaneous with its counterfeiting activity, Defendant had knowledge of Plaintiff's ownership of its trademarks and the fame and goodwill associated with the Power Wheels products.  *Id*. ¶ 39.  Without Plaintiff's authorization or consent, Defendant manufactures, markets, and distributes counterfeit products.  *Id*. ¶ 27.  These counterfeit products are nearly identical to Plaintiff's Power Wheels products, only with minor variations that no ordinary consumer would recognize.  *Id*. ¶ 30, Ex. C.  Through its website, www.fisher-price.online, Defendant offers counterfeit Power Wheels products for sale to consumers throughout the world, including those located in New York.  *Id*. ¶ 29.  Defendant's website prominently features identical or confusingly similar versions of Plaintiff's Power Wheels and Fisher-Price marks to mimic Plaintiff's website.  *Id.* ¶¶ 27, 32, 34.  Furthermore, Defendant's website lacks any information regarding Defendant's physical address or contact information.  Dkt. No. 2 ("Futterman Decl.") ¶¶ 13–14.  The absence of personal information has prevented Plaintiff from determining Defendant's true identity and location.  *Id.* ¶ 15.

### PROCEDURAL HISTORY

On November 19, 2021, Plaintiff filed this action against Defendant for counterfeiting of Plaintiff's registered trademarks; infringement of Plaintiff's registered trademarks; false designation of origin, passing off and unfair competition; and cybersquatting.  Compl. ¶ 1.  Three

days later, on November 22, 2021, the Court entered a Temporary Restraining Order ("TRO"). Dkt. No. 15.  On December 1, 2021, pursuant to the TRO, Plaintiff served Defendant with the summons, complaint, TRO, and all papers filed in support of Plaintiff's application.  Dkt. No. 29 ("Nastasi Aff.") ¶ 14.  On December 6, 2021, the Court held a Preliminary Injunction Show Cause Hearing, at which Defendant failed to appear.  *Id.* ¶ 16.  On the same day, the Court entered a Preliminary Injunction Order against Defendant mirroring the terms of the TRO and extending through the pendency of the action.  Dkt. No. 16.

To date, Defendant has not appeared in the case.  Furthermore, Defendant has failed to answer or otherwise move with respect to the complaint by the December 22, 2021 deadline. Nastasi Aff. ¶ 15.  In light of Defendant's default, on February 15, 2022, Plaintiff applied for a Clerk's Certificate of Default against Defendant.  Dkt. Nos. 25–26.  The Clerk of the Court subsequently entered a Certificate of Default against Defendant.  Dkt. No. 27.  On February 18, 2022, Plaintiff moved for default judgment and a permanent injunction against Defendant.[1]  Dkt. No. 28.  On June 24, 2022, Defendant failed to appear at the Court's hearing to address Plaintiff's motion for default judgment.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 55, the Court must follow a two-step procedure for the entry of judgment against a party who fails to defend: (1) the entry of a default, and (2)

---

[1] Plaintiff moved for default judgment against Defendant on its causes of action for counterfeiting of Plaintiff's trademarks; infringement of Plaintiff's trademarks; and cybersquatting.  In the absence of briefing on the claim for false designation of origin, passing off and unfair competition, the Court treats said claim as abandoned for purposes of the instant motion.  *See Daiuto v. Evolve Guest Controls, LLC,* 2020 WL 1466117, at *9 (E.D.N.Y. Mar. 4, 2020) ("[The plaintiff] wholly ignores the *prima facie* tort claim in his motion for default judgment.  He makes no effort either to show that the Amended Complaint's uncontested factual allegations suffice to establish liability for that cause of action or to prove any resulting damages. I therefore conclude that [the plaintiff] has abandoned that claim.").

the entry of a default judgment.  *See New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005).  The first step, entry of a default, simply "formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff."  *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011); *see also* Fed. R. Civ. P. 55(a).  The second step, entry of a default judgment, "converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted" by the pleadings.  *Mickalis Pawn Shop*, 645 F.3d at 128; *see also* Fed. R. Civ. P. 55(b).  To determine if the entry of default judgment is appropriate, the Court must determine whether allegations against the defaulting party are well-pleaded.  *See Mickalis Pawn Shop*, 645 F.3d at 137.

A defendant is "always free to ignore the judicial proceedings [and] risk a default judgment."  *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982).  Thus, because a party in default does not admit conclusions of law, "a district court need not agree that the alleged facts constitute a valid cause of action."  *Mickalis Pawn Shop*, 645 F.3d at 137.  Under Federal Rule of Civil Procedure 55, a plaintiff may only obtain from a default judgment relief equivalent to but not greater than that it would obtain in a contested proceeding assuming it prevailed on all its factual allegations.  *See Finkel v. Romanowicz*, 577 F.3d 79, 85 (2d Cir. 2009); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981) ("[A] district court has discretion under Rule 55(b)(2) once a default is determined to require proof of necessary facts and need not agree that the alleged facts constitute a valid cause of action.").  Therefore, the Court must "determine whether the plaintiff's allegations are sufficient to establish the defendant's liability as a matter of law."  *Finkel*, 577 F.3d at 84.

The Court assesses the legal sufficiency of Plaintiff's claims under the standard enunciated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), "aided by the additional step of drawing inferences in the non-defaulting party's favor," *WowWee Grp. Ltd. v. Meirly*, 2019 WL 1375470, at *5 (S.D.N.Y. Mar. 27, 2019).  However, courts must "supervise default judgments with extreme care to avoid miscarriages of justice." *Erwin DeMarino Trucking Co. v. Jackson*, 838 F. Supp. 160, 162 (S.D.N.Y. 1993).  "[A] plaintiff is not entitled to a default judgment and any concomitant damages as a matter of right simply by virtue of a defendant's procedural default." *Gould v. Marconi Dev. Grp., LLC*, 2020 WL 2042332, at *2 (N.D.N.Y. Apr. 28, 2020) (citing *Erwin DeMarino Trucking Co*., 838 F. Supp. at 162).

## DISCUSSION

### I.      Personal Jurisdiction

The Court previously determined there was personal jurisdiction when it issued a TRO. Nonetheless, it is appropriate for the Court to reaffirm its jurisdiction over Defendant before it grants a motion for default judgment and imposes permanent injunctive relief.  *See Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp*., 619 F.3d 207, 213 (2d Cir. 2010).  Plaintiff carries the burden of pleading that the Court has personal jurisdiction over the parties.  *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).

The Court's finding of personal jurisdiction must conform with the rules of the forum state—New York—and the Due Process Clause.  *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010).  Thus, the Court engages in a two-part analysis to determine personal jurisdiction over a non-domiciliary in a trademark case.  First, the Court applies the forum state's long-arm statute.  *See Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).  "If the long-arm statute permits personal jurisdiction, the second step is to

analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Id*. at 164.

Plaintiff cites Section 302(a)(1) of the New York Civil Practice Law and Rules to support personal jurisdiction over Defendant for allegedly shipping counterfeit products to New York through Defendant's website.  Compl. ¶ 30.  Section 302(a)(1) states that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state."  N.Y. C.P.L.R. § 302(a), (a)(1).  In other words, to establish personal jurisdiction under Section 302(a)(1): "(1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity."  *Eades v. Kennedy PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) (quoting *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir. 2013)).  Because Section 302(a)(1) is a "single act statute," "the 'single act' of selling counterfeit goods into New York satisfies the long-arm statute under section 302(a)(1)."  *Chloe*, 616 F.3d at 170.

A defendant need not be physically present in New York to "transact business"; rather, a defendant may satisfy the business transaction requirement if it "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246–47 (2d Cir. 2007) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  The rise of online commercial transactions requires that the doctrine of personal jurisdiction adapt and evolve with modern technological advances.  *See Hanson*, 357 U.S. at 250–51 ("As technological progress has increased the flow of commerce between States, the need for jurisdiction has undergone a similar increase.").  The Second Circuit has stated that a "website's interactivity may be useful for

analyzing personal jurisdiction under section 302(a)(1), but only insofar as it helps to decide whether the defendant 'transacts any business' in New York." *Best Van Lines, Inc.*, 490 F.3d at 252 (quoting *CutCo Indus. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986)).  A defendant purposefully avails itself of the forum state and thus transacts business if its website is "interactive" and "solicits information from potential buyers in New York in order for the defendant to sell them products in New York." *Spin Master Ltd., v. 158*, 463 F. Supp. 3d 348, 362 (S.D.N.Y. 2020); *see also Alpha Int'l, Inc. v. T-Reproductions, Inc.*, 2003 WL 21511957, at *3 (S.D.N.Y. July 1, 2003) ("Websites that permit information exchange between the defendant and viewers are deemed 'interactive.'"); *Thomas Publ'g Co. v. Indus. Quick Search*, 237 F. Supp. 2d 489, 492 (S.D.N.Y. 2002) ("If [defendant] wishes to operate an interactive website accessible in New York, there is no inequity in subjecting [defendant] to personal jurisdiction here.  If [defendant] does not want its website to subject it to personal jurisdiction here, it is free to set up a passive website that does not enable [defendant] to transact business in New York.").  Here, through its infringing website, Defendant offers to sell its counterfeit products to customers located in the United States, including in New York.  Defendant's website displays prices in U.S. dollars and accepts payment via PayPal or credit card.  Compl. ¶ 30.

"The offering for sale of even one copy of an allegedly infringing item, even if no sale results, is sufficient to give personal jurisdiction over the alleged infringer under N.Y. CPLR § 302(a), subd. 1, 2 and 3." *Cartier v. Seah LLC*, 598 F. Supp. 2d 422, 425 (S.D.N.Y. 2009); *see also Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, 2016 WL 3748480, at *3 (S.D.N.Y. July 8, 2016) ("A website that does more than provide information about a product and allows customers to purchase goods online, is a 'highly interactive website,' which may provide a basis for personal jurisdiction under CPLR § 302(a)."); *Mattel, Inc. v. Animefun Store*,

2020 WL 2097624, at *4 n.7 (S.D.N.Y. May 1, 2020) (stating that "the Court would have no trouble concluding that it possesses personal jurisdiction" under N.Y. C.P.L.R. § 302(a) over defendants that "offered counterfeit goods for sale in New York and provided for shipping to New York"); *Audiovox Corp. v. S. China Enter., Inc*., 2012 WL 3061518, at *3 (E.D.N.Y. July 26, 2012) ("[I]f a website is interactive and allows a buyer in New York to submit an order online, courts typically find that the website operator is 'transacting business' in New York and is therefore subject to the court's jurisdiction."). As part of its investigation, Plaintiff purchased counterfeit products on Defendant's website. Compl. ¶ 35. Defendant then processed Plaintiff's purchase in U.S. dollars and agreed to ship the counterfeit products to New York. *Id*. ¶ 35. Defendant did not sell its counterfeit products to the highest bidder such that its sale to New York was coincidental. *Id*., Ex. C–D. Instead, Defendant intentionally offered and transacted to sell counterfeit products to New York. *Id*. ¶ 35. In doing so, Defendant purposefully availed itself of the privileges of conducting activities in New York. *See WowWee Grp.*, 2019 WL 1375470, at *3 (finding that "each of the thirty-four Defaulting Defendants who made sales into New York State purposefully availed themselves of the privileges of conducting activities in New York by shipped counterfeit items to New York addresses"); *see also Brady v. Anker Innovations Ltd*., 2020 WL 158760, at *5 (S.D.N.Y. Jan. 13, 2020) (finding that a defendant's sale of at least one product to New York through Amazon constitutes "internet-based activities established regular business with foreign jurisdictions, including New York"); *EnviroCare Techs., LLC v. Simanovsky*, 2012 WL 2001443, at *4 (E.D.N.Y. June 4, 2012) (finding that defendants who conducted at least one sale to New York through Amazon "avail[ed] themselves of the benefits of this greatly expanded marketplace").

Section 302(a)(1) also requires an "articulable nexus or substantial relationship between the business transaction and the claim asserted." *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 93 (S.D.N.Y. 2015). Defendant's sale of counterfeit products to Plaintiff in New York has a substantial relationship with Plaintiff's claim that Defendant counterfeited and infringed upon the Power Wheels and Fisher-Price marks in violation of the Lanham Act. *See Spin Master,* 463 F. Supp. 3d at 364 ("There is no question that the business transaction (*i.e.*, the offer and/or sale of the Counterfeit Products) in New York has a substantial relationship with the claim asserted in this action against the six Defaulting Defendants (*i.e.*, Defaulting Defendants' offers or sales of products that infringe upon trademarks or contain counterfeited trademarks)."). Due to its default, Defendant has not presented evidence to suggest the contrary. Thus, Plaintiff has sufficiently pleaded that its claims arise from Defendant's business activity in New York.

Although Section 302(a)(1) permits personal jurisdiction, the Court must also determine whether personal jurisdiction comports with constitutional due process. The Due Process Clause requires minimum contacts with the forum state such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Because Section 302(a)(1) permits the exercise of personal jurisdiction in a narrower range of circumstances than the Due Process Clause, the Court's conclusion that it may exercise personal jurisdiction under Section 302(a)(1) over Defendant necessarily carries with it the further conclusion that the exercise of such jurisdiction comports with constitutional due process. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006) ("[T]he constitutional requirements of personal jurisdiction are satisfied because application of § 302(a) meets due process requirements."); *Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 469 (S.D.N.Y. 2008) ("[T]he Due Process Clause permits the

exercise of jurisdiction in a broader range of circumstances of N.Y. C.P.L.R. § 302, and a foreign defendant meeting the standards of § 302 will satisfy the due process standard.").  The Court therefore finds personal jurisdiction over Defendant.

## II.    Liability

Plaintiff's allegations are sufficient to establish liability on its causes of action for trademark counterfeiting and infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1116(d), 1117(b)–(c), and cybersquatting in violation of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1).  The Court turns first to Plaintiff's claims under the Lanham Act before turning to its claim under the Anti-Cybersquatting Consumer Protection Act.

### A.    Trademark Counterfeiting and Infringement

Plaintiff's allegations are sufficient to establish liability on its trademark counterfeiting and infringement claims under the Lanham Act.  The Lanham Act protects against the "reproduction, counterfeit, copy, or colorable imitation of a registered mark" and its application to "labels, signs, prints, packages, wrappers, receptacles or advertisements" where "such use is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1).  To prevail on trademark counterfeiting and infringement claims, a plaintiff must establish that (1) it has a valid mark entitled to protection and (2) the defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods.  *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).  Plaintiff has established both elements necessary to prevail on its trademark counterfeiting and infringement claims.

### 1.    Validity of Plaintiff's Marks

To establish that a mark is entitled to protection, a plaintiff may provide a certificate of the mark's registration with the U.S. Patent and Trademark Office as prima facie evidence of its validity.  *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt, Inc.*, 192 F.3d 337, 345 (2d Cir. 1999).

Plaintiff owns the U.S. Trademark Registration for the Power Wheels marks and Fisher-Price marks. Compl. ¶ 18, Ex. B. Due to its default, Defendant has failed to overcome the presumption that Power Wheels and Fisher-Price marks are valid and entitled to protection.

### 2. Likelihood of Confusion

To determine if Plaintiff has established that Defendant's use of the mark is likely to cause consumers confusion, the Court may consider the eight *Polaroid* factors: (1) the strength of the plaintiff's mark, (2) the degree of similarity between the two marks, (3) the proximity of the parties' areas of commerce, (4) the likelihood that the plaintiff will bridge the gap separating their areas of activity, (5) actual consumer confusion, (6) whether the defendant acted in bad faith or was otherwise reprehensible in adopting the mark, (7) the quality of the defendant's product, and (8) the sophistication of the relevant consumer group. *Polaroid v. Polarad Elecs. Corp,* 287 F.3d 492, 495 (2d Cir. 1961). However, when a defendant sells counterfeit items, the Court "need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003).

The Lanham Act defines a "counterfeit" as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. The counterfeit products listed on Defendant's website are nearly identical to Plaintiff's Power Wheels products. Compl. ¶ 30, Ex. C. Defendant has used identical copies of Plaintiff's marks in connection with Defendant's website and its marketing, promotion, and sale of the counterfeit Power Wheels products. *Id.* ¶ 24, Ex. C. Furthermore, Defendant has used Plaintiff's images of the Power Wheels products on Defendant's website. *Id*. ¶ 26. Because they are substantially similar to Plaintiff's Power Wheels products in design and branding, the items listed for sale on Defendant's website are "counterfeit" within the meaning of the Lanham Act.

Accordingly, Plaintiff has established that Defendant's counterfeit products are likely to cause consumers confusion as to the origin or sponsorship of the goods because "counterfeits, by their very nature, cause confusion." *Off-White LLC v. 5HK5584*, 2020 WL 1646692, at *5 (S.D.N.Y. Apr. 3, 2020) (quoting *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 433 (S.D.N.Y. 2012)).

* * *

Plaintiff's allegations are sufficient to establish liability on its trademark counterfeiting and infringement claims.

### B.        Cybersquatting

Plaintiff's allegations are also sufficient to establish liability on its cybersquatting claim. The Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), protects consumers and holders of distinctive trademarks from "cybersquatting," which "involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners." *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 493 (2d Cir. 2000).  The ACPA imposes liability on parties who, "without regard to the goods or services of the parties," register, traffic in, or use a domain name that is distinctive or famous with the "bad faith intent to profit from that mark."  15 U.S.C. § 1125(d)(1)(A).  To successfully assert a claim under the ACPA, a plaintiff must demonstrate that (1) its trademark is either distinctive or famous, (2) the domain name is identical or confusingly similar to the trademark, and (3) the defendant acted with a bad-faith intent to profit from the trademark.  *See Webadviso v. Bank of Am. Corp.*, 448 F. App'x 95, 97 (2d Cir. 2011) (summary order).

### 1.    Distinctiveness or Fame of Plaintiff's Marks

In the Second Circuit, registered trademarks are entitled to a presumption of distinctiveness.  *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986); *Kelly-Brown v. Winfrey*, 659 F. App'x 55, 59 (2d Cir. 2016).  Here, Plaintiff's trademarks are registered with the U.S. Patent and Trademark Office.  Compl. ¶ 18, Ex. B.  As a result of its default and failure to answer Plaintiff's complaint, Defendant has not overcome this presumption.  Accordingly, the Court concludes that the Power Wheels and Fisher-Price marks are distinctive for purposes of the ACPA and need not decide if the marks are also famous.

### 2.    Similarity of Defendant's Domain Name

To establish that Defendant's domain name is confusingly similar to the Fisher-Price mark, Plaintiff must show that "[its] mark and the defendant's domain name are so similar in sight, sound, or meaning that they could be confused."  5 McCarthy on Trademarks § 25:78 (4th ed. 2002).  Because Defendant's domain name www.fisher-price.online contains the Fisher-Price mark, Defendant's domain name is sufficiently similar in sight, sound, and meaning to confuse consumers as to whether the infringing website is affiliated with Plaintiff's mark.  *See Diesel S.P.A. v. Does*, 2016 WL 96171, at *7 (S.D.N.Y. Jan. 8, 2016).  The fact that Defendant's website name includes the additional word "'online' . . . does not indicate a separation from the mark."  *Ideavillage Prod. Corp. v. Liuzhou Weimao Mobile Accessory Co.*, 2021 WL 3621788, at *3 (S.D.N.Y. Aug. 16, 2021); *see also id.* (holding that copperfitonlineshop.com is confusingly similar to plaintiff's "COPPER FIT" trademark); *Mattel, Inc. v. Adventure Apparel*, 2001 WL 1035140, at *2 (S.D.N.Y. Sept. 7, 2001) (finding that barbiesbeachwear.com and barbiesclothing.com are confusingly similar to plaintiff's "BARBIE" trademark).  Given its default, Defendant offers no argument to suggest that www.fisher-price.online is not confusingly

13

similar to the Fisher-Price mark.  Thus, the Court finds that Defendant's domain name

www.fisher-price.online is confusingly similar to Plaintiffs' registered marks.

### 3.      Defendant's Bad Faith

The ACPA provides nine non-exclusive factors for the Court to consider in determining

whether a defendant acted in bad faith:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;

> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B)(i).  The Second Circuit, however, has clarified that courts "are not limited to considering just the listed factors when making [a] determination of whether the statutory criterion has been met." *Sporty's Farm*, 202 F.3d at 498.

Regarding the first factor, Defendant did not have any intellectual property rights in the Power Wheels and Fisher-Price marks.  Second, the domain name www.fisher-price.online does not include a legal name or any name commonly used to identify Defendant.  Furthermore, there is no evidence that Defendant used its domain name in connection with the bona fide offering of any goods or services or noncommercial or fair use of the mark.  Rather, the complaint alleges that Defendant used the domain name to infringe on Plaintiffs' registered trademarks and sell or attempt to sell counterfeit products.  Compl. ¶ 34.  Given that Defendant selected a domain name and marks that are virtually identical to Plaintiff's marks to sell counterfeit products, the Court may presume that Defendant intended to profit from the goodwill and reputation of Plaintiff, the Power Wheels marks, the Fisher-Price marks, and Power Wheels products.  *Id*. ¶ 27, Ex. C; *Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 132 (S.D.N.Y. 1993) ("[B]ased upon the copying of a well-known mark and trade dress and the continued use of that mark and trade dress after plaintiff conveyed its concerns to defendant, the Court also has found an element of 'bad faith.'").  Thus, the Court may infer Defendant's bad faith from its "intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." *Webadviso*, 448 F. App'x at 98 (quoting 15 U.S.C. § 1125(d)(1)(B)(i)(V)).

Further, Defendant may be found to have acted in bad faith despite only registering one infringing domain name. *See Soter Techs., LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 404 (S.D.N.Y. 2021). Although the 15 U.S.C. § 1125(d)(1)(B)(i) factors refer to the registration of "multiple" domain names, "a defendant's conduct is not excused if she only used one of the plaintiff's trademarks in commerce." *Id.* Thus, the registration of a single domain name when Defendant knows that it incorporates a competitor's mark still supports an inference of bad faith. *See Chanel, Inc. v. Richardson*, 2018 WL 6097865, at *5–8 (S.D.N.Y. Nov. 20, 2018) (citing *Prime Publishers, Inc. v. Am.-Republican, Inc.*, 160 F. Supp. 2d 266, 281 (D. Conn. 2001)).

In addition, the Court may still determine that the bad faith element is satisfied when a defendant fails to argue that its operations were "noncommercial" or a "fair use of the mark." *Sporty's Farm LLC*, 202 F.3d at 499. Here, although Defendant used, rather than withheld, the domain name www.fisher-price.online from Plaintiff, it did not present any bona fide explanations for its sale of counterfeit products. Furthermore, Defendant failed to rebut Plaintiff's allegations that it acted in bad faith by using the website to infringe on Plaintiffs' registered trademarks and sell counterfeit products. Accordingly, Plaintiff has shown Defendant's liability on the cybersquatting claim.

## III.   Statutory Damages

Although Plaintiff's allegations establish Defendant's liability, they do not resolve the issue of damages, and a plaintiff "must substantiate their claims with evidence to prove the extent of their damages." *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 627 (S.D.N.Y. 2011).

Plaintiff requests $200,000 per counterfeit mark per type of good or service sold, offered for sale, or distributed for a total award of $600,000 in statutory damages for trademark

counterfeiting and trademark infringement, plus post-judgment interest calculated pursuant to the statutory rate, under the Lanham Act, 15 U.S.C. § 1117(c).  Nastasi Aff. ¶ 8.

The Lanham Act provides for statutory damages of up to "$2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just."  15 U.S.C. § 1117(c)(2).  Because Defendant defaulted and failed to provide evidence of sales or reduced expenses from its counterfeit products, Defendant's profits are unknown. Nastasi Aff. ¶¶ 21–26.  Plaintiff argues that it was deprived of the ability to determine actual damages and requests $200,000 per mark for Defendant's violation of three trademark registrations.  *Id.* ¶ 25.  To substantiate this award, Plaintiff alleges that Defendant infringed on two Fisher-Price marks (U.S. Reg. Nos.: 3,279,454 for "FISHER-PRICE" for goods in Class 28; 4,115,688 for "FISHER-PRICE" for services in Class 35) and one Power Wheels mark (U.S. Reg. No. 1,374,017 for "POWER WHEELS" for goods in Class 28) when it displayed identical copies of Plaintiff's marks on its website and counterfeit products.  Dkt. No. 4 ("Moore Decl.") ¶¶ 14, 24–26, Exs. B–C.

In a supplemental submission, Plaintiff's Associate General Counsel and Senior Director for Intellectual Property explains that it is difficult to calculate actual or estimated damages related to the counterfeiting of its well-known toy brands, including Barbie, Fisher-Price, Hot Wheels, and UNO, among others.  Dkt. No. 36 ¶ 3.  He lays out facts, however, that demonstrate that those losses are substantial.  According to a recent consumer survey, 54% of respondents said that they had purchased a counterfeit toy or game online—a 200% increase from the prior year.  *Id.* ¶ 8.  Furthermore, the revenue generated from the sale of counterfeit toys in the United States is estimated to have reached $32.3 billion in 2019.  *Id.* ¶ 7.  Given its market-leading position, it is reasonable to assume that Plaintiff faced losses in connection with a reasonable

percentage of those sales.  *Id.*  In addition, Plaintiff likely experienced damage to the value or goodwill of its brands.  *Id*. ¶ 6.  17% of survey respondents said that they would no longer trust a brand if they ever bought fakes, and 24% of respondents reported that they would no longer purchase a brand's products if they found that the brand had counterfeits.  *Id.* ¶ 8.  Finally, sales of Plaintiff's authentic products improved by nearly 180% following the removal of listings for counterfeit products on a well-known U.S. platform that also sells Plaintiff's authentic products. *Id.* ¶ 5.  These facts suggest that Plaintiff's losses from Defendant's counterfeiting activity are extensive.

When a plaintiff's standard character mark is subject to numerous trademark registrations, and a defendant counterfeits or infringes on those trademark registrations, the Court may find that the defendant committed multiple trademark violations for the purposes of calculating statutory damages.  *See Yahoo! Inc. v. XYZ Companies*, 872 F. Supp. 2d 300, 307 (S.D.N.Y. 2011) (finding that since the Yahoo! standard character mark was the subject of five trademark registrations, the defendants counterfeited five registered marks when calculating statutory damages).  Here, Plaintiff's standard character marks for Power Wheel and Fisher-Price are protected by numerous trademark registrations.  Defendant infringed on two Fisher-Price trademark registrations and one Power Wheels trademark registration on or in connection with the sale of counterfeit toy products (one "good") and through the services offered by Defendant's website (one "service").  Thus, Plaintiff's request for a statutory damage award for all three trademark registration violations is appropriate.  However, the Court must next determine whether the proposed relief of $200,000 per counterfeit mark is appropriate.

Congress enacted the statutory damages remedy in trademark counterfeiting cases to address the reality that "records are frequently nonexistent, inadequate, or deceptively kept,"

making the counterfeiter's profits almost impossible to ascertain.  *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 315 F Supp. 2d 511, 520 (S.D.N.Y. 2004); *see also Coach, Inc. v. Weng*, 2014 WL 2604032, at *16 (S.D.N.Y. June 9, 2014) ("Section 1117(c) of the Lanham Act was created to give victims of trademark infringement and unfair competition an avenue for recovering damages when a defendant hides, alters, or destroys business records.").  When determining the appropriate statutory damages award, courts typically consider the following factors: (1) the expenses saved and the profits reaped by the defendant; (2) the revenues lost by the plaintiff; (3) the value of the mark; (4) the scale of the defendant's infringement; (5) whether the defendant's conduct was innocent or willful; (6) whether the defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant and others.  *Spin Master*, 463 F. Supp. 3d at 379; *see also Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986).

Generally, "[t]he lack of information about any of the defendants' sales and profits, and the suspect nature of any information that was provided, make statutory damages particularly appropriate."  *Nike, Inc. v. Top Brand Co.*, 2006 WL 2884437, at *2 (S.D.N.Y. Oct. 6, 2006).  Furthermore, "[t]he trademark counterfeiter, particularly the counterfeiter who does not appear, is not entitled to a reduction on the assumption it sold the less expensive goods or an adjustment for expenses it has not proven."  *Spin Master*, 463 F. Supp. 3d at 372.  Here, Defendant's concealment of its sales activities and refusal to comply with the Court's order for expedited discovery in the TRO have barred Plaintiff from measuring Defendant's reaped profits and reduced expenses (factor one) and the scale of its infringement (factor four).  Futterman Decl. ¶¶ 4, 15; Nastasi Aff. ¶¶ 21–26.  In such cases, "it is appropriate for a court to rely on the revenue lost by Plaintiffs, rather than the profits earned by Defendant and further, to base that

19

calculation on the assumption that Defendant sold the highest-grossing of the Plaintiffs'
products." *Spin Master*, 463 F. Supp. 3d at 372.  In the present case, although Plaintiff does not
provide any estimate of its lost profits from Defendant's counterfeiting activity (factor two), it
has set forth facts from which the Court can infer they were substantial.

In the absence of more specific information about the defendant's profits and the
plaintiff's lost revenue, courts focus on the deterrent purpose of statutory damage awards.  *See
Kenneth Jay Lane Inc. v. Heavenly Apparel, Inc.*, 2006 WL 728407 at *6. (S.D.N.Y. Mar. 21,
2006) ("[A] court must strive to ensure that the amount fixed will act as a specific deterrent to
the defendant(s) before the court and as a general deterrent to others who might consider
engaging in infringing conduct in the future.").  In these circumstances, courts in this District
tend to award between $25,000 and $250,000 per mark in statutory damages to achieve their
deterrence goals when the defendant is a willful infringer.  *See, e.g.*, *Ermenegildo Zenga Corp. v.
56th St. Menswear, Inc.*, 2008 WL 4449533 at *5–6 (S.D.N.Y. Oct. 2, 2008) (awarding $200,000
per counterfeit mark for five marks); *Pitbull Prods., Inc. v. Universal Netmedia, Inc*., 2007 WL
3287368 at *3–4 (S.D.N.Y. Nov. 7, 2007) (awarding $250,000 per counterfeit mark for two
marks); *Kenneth Jay Lane, Inc. v. Heavenly Apparel, Inc.*, 2006 WL 728407 at *6 (S.D.N.Y.
Mar. 21, 2006) (awarding $125,000 per counterfeit mark for three marks); *Polo Ralph Lauren,
L.P. v. 3M Trading Co.*, 1999 WL 33740332 at *7 (S.D.N.Y. Apr. 19, 1999) (awarding $25,000
per counterfeit mark for ten marks); *All-Star Mktg. Grp., LLC v. Media Brands Co.*, 775 F. Supp.
2d 613, 624–25 (S.D.N.Y. 2011) (awarding $25,000 to $50,000 per counterfeit mark for seven
marks).  Although Plaintiff's request for $200,000 per mark falls within this range, it approaches
the upper threshold of awards.  Thus, the Court must determine whether the balance of factors
justifies this heightened award.

"An infringement is willful where the defendant had knowledge or recklessly disregarded the possibility that its actions constituted infringement." *Streamlight, Inc. v. Gindi*, 2019 WL 6733022, at *13 (E.D.N.Y. Oct. 1, 2019).  Furthermore, "courts in [this Circuit] have concluded that use of marks that are 'virtually identical' to the registered marks renders 'inescapable' the conclusion that the defendant's infringement and counterfeiting was intentional." *WowWee Grp.*, 2019 WL 1375470, at *10.  Given that Defendant selected a domain name and marks that are virtually identical to Plaintiff's marks to sell counterfeit products, the Court may presume that Defendant intended to profit from Plaintiff's reputation and is a willful infringer.  *Cf. supra* Section II.B.3.  By virtue of its default, Defendant has done nothing to dispel that conclusion. Thus, Defendant's willful violation of Plaintiff's intellectual property rights (factor five) weighs in favor of awarding the requested amount.  Defendant's failure to participate in expedited discovery (factor six) similarly supports Plaintiff's request.  *See Sara Lee Corp. v. Bags of New York, Inc*., 36 F. Supp. 2d 161, 170 (S.D.N.Y. 1999) (affirming "precedents instructing that awards increase to deter and punish a willful continuous course of infringements and defiance of the judicial process").  In addition, Plaintiff is a leading producer of distinctive marks and renowned toys.  Moore Decl. ¶¶ 6–7.  Thus, the high value of Plaintiff's marks (factor three) and the need to deter other possible infringers from exploiting Plaintiff's reputable marks (factor four) also support a heightened statutory damage award against Defendant.  *See Mattel, Inc. v. Agogo Store*, 2022 WL 525698, at *9 (S.D.N.Y. Jan. 31, 2022) (finding that the value of Mattel, Inc. trademarks and need for general deterrence justify heightened statutory damage awards); *Mattel, Inc. v. 1622758984*, 2020 WL 2832812, at *7 (S.D.N.Y. May 31, 2020) (same). Furthermore, "courts have supported an inference of a broad scope of operations in cases dealing specifically with websites that ship and sell to a wide geographic range." *AW Licensing, LLC v.*

*Bao*, 2016 WL 4137453, at *3 (S.D.N.Y. Aug. 2, 2016).  Here, Defendant's infringing website advertises, distributes, sells, and ships counterfeiting products "directly to consumers worldwide and specifically to consumers residing in the U.S., including New York," suggesting that Defendant's reaped profits are extensive.  Futterman Decl. ¶ 3.  Collectively, these factors support Plaintiff's requested damages of $200,000 per mark.

The evidence, however, does not support a cumulative award of $600,000 per product sold.  Although the Lanham Act calls for statutory damages on a per mark rather than a per product basis, 15 U.S.C. § 1117(c)(2), in this case, each sale by Defendant of the same product infringed on multiple similar marks owned by Plaintiff.  It is reasonable to assume that the incremental harm to Plaintiff of each successive infringement by sale of the same product is less than if Defendant had sold multiple products each infringing on a different mark or if Defendant had sold a single product that infringed on multiple different marks that were not substantially similar.  *See N. Atl. Operating Co., Inc. v. Evergreen Distributors*, *LLC*, 2015 WL 13856995, at *14 (E.D.N.Y. Jan. 5, 2015) ("[M]ultiple counterfeit products . . . would likely lead to greater market confusion.").  It also is reasonable to assume that the amount of statutory damages necessary to deter a defendant from infringing in the future is less when the defendant sells a single product that infringes on multiple similar marks than when it sells a product that infringes on different marks or when it sells multiple products.  Moreover, in this case, the incremental deterrent effect of the award of statutory damages is marginal.  Defendant will be subject to an injunction that permanently prevents it from future trademark infringements; if the injunction (carrying contempt sanctions) does not deter Defendant in the future, statutory damages might not do so.  *See Mattel Inc. v. 1622758984*, 2020 WL 2832812, at *7 (S.D.N.Y. May 31, 2020) ("[B]ecause the Court has approved a permanent injunction in this action, specific deterrence

(factor 7) does not necessarily militate for a higher award.").  Finally, although Plaintiff asks that the Court award $600,000, it has not provided any rationale for awarding this amount.  Courts in this District have reduced a plaintiff's requested damages amount when there are insufficient facts to support that sum.  *See Pitbull Prods., Inc. v. Universal Netmedia, Inc*., 2007 WL 3287368, at *4 (S.D.N.Y. Nov. 7, 2007) (reducing plaintiff's request of $1,000,000 per mark to $250,000 per mark where plaintiff "has not provided any rationale for awarding the maximum of $1,000,000 per mark" and defendant's default "left the Court with no information as to any of the factors relating to the defendants' circumstances"); *Rodgers v. Anderson*, 2005 WL 950021, at *3 (S.D.N.Y. Apr. 26, 2005) (reducing plaintiff's request of $500,000 per mark to $250,000 per mark and noting that plaintiff "has not provided any basis for that figure nor any cases in analogous situations that would support such an amount").  In light of these countervailing factors, the Court will reduce Plaintiff's requested award of $200,000 per mark to $180,000 per mark for a total of $540,000 in statutory damages.  The Court will also award post-judgment interest pursuant to 28 U.S.C. § 1961(a), which states that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court."  *See also Mattel, Inc. v. 1622758984*, 2020 WL 2832812, at *7 (S.D.N.Y. May 31, 2020) (awarding post-judgment interest pursuant to 28 U.S.C. § 1961 in addition to statutory damage awards for trademark counterfeiting and infringement).

## IV.    Permanent Injunction

Plaintiff requests a permanent injunction to enjoin Defendant from future trademark violations under the Lanham Act, 15 U.S.C. § 1116, and cybersquatting activity under the ACPA, 15 U.S.C. § 1125(d)(1).

A. **Injunction Against Trademark Counterfeiting and Infringement**

The Court will grant Plaintiff's request to permanently enjoin Defendant from further counterfeiting or infringement of the Power Wheels or Fisher-Price marks.

When a plaintiff has succeeded on the merits of its trademark counterfeiting and infringement claim, the Court may enter a permanent injunction to prevent further violations of trademark infringement and counterfeiting if the plaintiff has demonstrated: "(1) that it suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that the balance of hardships between the parties warrants a remedy in equity for the plaintiff; and (4) that the public interest would not be disserved." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also* 15 U.S.C. § 1116; *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 511 F. App'x 81, 85 (2d Cir. 2013) (summary order).

As to the first factor, in trademark counterfeiting and infringement cases, "[t]he loss of reputation and goodwill constitutes irreparable harm." *Really Good Stuff, LLC v. BAP Inv'rs, L.C.*, 813 F. App'x 39, 44 (2d Cir. 2020). By misappropriating Plaintiff's Power Wheels and Fisher-Price marks, Defendant takes advantage of Plaintiff's earned goodwill and reduces Plaintiff's ability to control its reputation. *See New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 325 (S.D.N.Y. 2010). Given that Defendant's counterfeit products may be of inferior quality and packaging, the likelihood of confusion between Plaintiff's Power Wheels products and Defendant's products harms Plaintiff's goodwill and reputation. Moore Decl. ¶ 30. Furthermore, courts are more likely to find irreparable harm in trademark counterfeiting or infringement when the plaintiff shows that "determining the amount of damages from [defendant's] infringing conduct [is] especially difficult, if not impossible." *Mint, Inc. v. Amad,* 2011 WL 1792570, at *3 (S.D.N.Y. May 9, 2011). Because of Defendant's failure to appear in this action, Plaintiff was unable to obtain complete and accurate information

regarding the actual profits derived from Defendant's sales of counterfeit products.  Nastasi Aff. ¶¶ 21–24.  And, as noted, Plaintiff itself cannot calculate actual or estimated damages relating to the counterfeiting at issue here.  Dkt. No. 36 ¶ 3.  As a result, Plaintiff's actual damages are effectively impossible to measure.  Nastasi Aff. ¶ 25.  Given the difficulties in quantifying the loss of Plaintiff's goodwill and reputation, Plaintiff suffered irreparable harm.

As to the second factor, a plaintiff has no adequate remedy at law if it shows that, "absent an injunction, the defendant is likely to continue" its infringement.  *Pearson Educ., Inc. v. Vergara*, 2010 WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010).  In default judgment cases, courts "may infer from a defendant's default that it is willing to or may continue its infringement."  *Id.* at *12.  Moreover, because its website does not list any contact information, Defendant may avoid detection and continue to sell its counterfeit products with anonymity.  Futterman Decl. ¶¶ 13–15.  Given the considerable threat of future infringement, Plaintiff has no adequate remedy at law.

As to the third factor, when courts balance the hardships between the parties, "an infringer . . . cannot complain about the loss of ability to offer its infringing product."  *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012).  Furthermore, given its default, Defendant has failed to identify any other valid hardships for the Court to consider.  Thus, the balance of hardships favors Plaintiff.

Finally, a permanent injunction would serve the public interest because "the public has an interest . . . in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality."  *N.Y.C. Triathlon, LLC.*, 704 F. Supp. 2d at 344.

### B.    Injunction Mandating Document Retention

Plaintiff asks the Court to enjoin Defendant from:

[S]ecreting, concealing, destroying, altering, selling off, transferring or otherwise disposing of and/or dealing with: (i) Counterfeit Products; (ii) any computer files, data, business records, documents or any other records or evidence relating to:

i. Defendant's Infringing Domain Name and/or Defendant's Website;

ii. Defendant's Assets; and

iii. the manufacture, importation, exportation, advertising, marketing, promotion, distribution, display, offering for sale and/or sale of Counterfeit Products by Defendant and by their respective officers, employees, agents, servants and all persons in active concert or participation with any of them.

Dkt. No. 31 ¶ III(1)(e).

An injunction should be "'narrowly tailored to fit specific legal violations' because the district court 'should not impose unnecessary burdens on lawful activity.'"  *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 299 (2d Cir. 1999) (quoting *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)).  However, the Court may "impose recordkeeping requirements ancillary to an injunction and to make injunctive relief effective."  *Spin Master*, 463 F. Supp. 3d at 379; *cf. S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1040 n.11 (2d Cir. 1990) (characterizing an injunction against document destruction as "innocuous").  Because Plaintiff's request is limited to records regarding illegal activity, an injunction will not restrain otherwise lawful activity.  Thus, Plaintiff's request for injunctive relief regarding document retention is permissible.

### C.    Injunction against Parties Acting in Concert with Defendant

While the Court may grant Plaintiff's request to enjoin Defendant from continued trademark counterfeiting and infringement, the language of the proposed permanent injunction is too broad in several respects.  Federal Rule of Civil Procedure 65 governs the Court's power to permanently enjoin parties and non-parties to a dispute.  Federal Rule of Civil Procedure 65(d)(2) authorizes the Court to enjoin "only" the following who receive actual notice of the

injunction: "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." Fed. R. Civ. P. 65(d)(2). However, Paragraph III(1) of the proposed permanent injunction seeks to enjoin "Defendant, their respective officers, agents, servants, employees, and all persons acting in concert with or under the direction of Defendant (regardless of whether located in the United States or abroad), who receive actual notice of this Order." Dkt. No. 31 ¶ III(1). The Court will replace the proposed language with the language of Federal Rule of Civil Procedure 65(d)(2) by replacing "acting in concert" with "acting in active concert." *See Spin Master*, 463 F. Supp. 3d at 377.

### D. Injunction against Financial Institutions and Third-Party Service Providers

Paragraphs III(3)–(4) of the proposed permanent injunction ask for broad injunctive relief against "Financial Institutions" and "Third Party Service Providers." Dkt. No. 31. Financial Institutions are defined as:

> Any banks, financial institutions, credit card companies and payment processing agencies, such as PayPal Inc. ("PayPal"), Payoneer Inc., the Alibaba Group d/b/a Alibaba.com payment services (e.g., Alipay.com Co., Ltd., Ant Financial Services Group), PingPong Global Solutions, Inc. and other companies or agencies that engage in the processing or transfer of money and/or real or personal property of Defendant

Dkt. No. 31 at iii.

Third Party Service Providers are defined as:

> Any third party providing services in connection with Defendant's Counterfeit Products and/or Defendant's Website, including, without limitation, Shopify, Internet Service Providers ("ISP"), back-end service providers, web designers, merchant account providers, any providing shipping and/or fulfillment services, website hosts (such as Cloudflare), domain name registrars (such as Dynadot) and domain name registries.

*Id.*

Generally, the Court lacks authority to enjoin persons who are not a party to the litigation and "over whom it has not acquired in personam jurisdiction." 11A Wright & Miller, Federal Practice and Procedure § 2956 (3d ed. 2020) (hereinafter, "Wright & Miller"). As a result, courts may violate due process protections by holding a nonparty in contempt for engaging in enjoined conduct. *Id*. At the same time, third parties "cannot do indirectly through a privy what it is circumscribed from doing directly and that jurisdiction resides over privies." *Spin Master*, 463 F. Supp. 3d at 380. Thus, Federal Rule of Civil Procedure 65(d) provides a limited exception to the principle that a court may not enjoin non-parties. Under Federal Rule of Civil Procedure 65(d)(2) and 65(d)(3), the Court may enjoin officers, agents, servants, employees, attorneys, and others in "active concert and participation" with the enjoined defendant who have notice of the injunction. "[A]ctive concert or participation" exists if the third party "aided and abetted" the party subject to the injunction," which requires showing "that the non-party had actual knowledge of the judicial decree and violated it, and that the challenged action was taken for the benefit of, or to assist, a party subject to the decree." *Arista Records, LLC v. Tkach*, 122 F. Supp. 3d 32, 36 (S.D.N.Y. 2015). Federal Rule of Civil Procedure 65(d) assumes that the named enjoined party "is an adequate representative of the rights of those persons listed in the rule who are not in a derivative relationship with the defendant." Wright & Miller § 2956. By enjoining non-parties in "active concert or participation with" the enjoined party and its agents, Federal Rule of Civil Procedure 65(d) seeks "to codify the common-law doctrine that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although [those aider and abettors] were not parties to the original proceeding." *Doctor's Assocs., Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, 302–03 (2d Cir. 1999).

For these reasons, the Court will only enjoin Financial Institutions or Third-Party Service providers in "active concert or participation" with Defendant from infringing Plaintiff's marks. However, the proposed permanent injunction seeks to bind Financial Institutions and Third-Party Service Providers without any finding that they are in "active concert or participation" with Defendant.  Plaintiff seeks to enjoin "[a]ny banks, financial institutions, credit card companies and payment processing agencies . . . that engage in the processing or transfer of money and/or real or personal property of Defendant" and "[a]ny third party providing services in connection with Defendant's Counterfeit Products and/or Defendant's Website," even though those nonparties may not be privy the enjoined activity.  *Spin Master*, 463 F. Supp. 3d at 380.  The Court cannot prejudge "whether any particular financial institution or third party service provider is necessarily and by definition an aider and abettor."  *Id.* at 380; *see also Allstar Mktg. Grp., LLC v. 158*, 2019 WL 3936879, at *3 (S.D.N.Y. Aug. 20, 2019) ("The Court cannot conclude that a third-party who merely holds the Defaulting Defendants' assets—which may be wholly unrelated to the counterfeiting at issue in this case—is by definition 'in active concert or participation' with the Defaulting Defendants."); *Nike, Inc. v. Wu*, 2020 WL 257475, at *19 (S.D.N.Y. Jan. 17, 2020) ("Courts in this district have repeatedly rejected the argument that a bank is 'in active concert and participation' when it provides routine banking activities to an enjoined party.").  Thus, the Court will insert the language of "acting in concert with or under the direction of Defendant" to Plaintiff's definition of Third-Party Service Providers or Financial Institutions.  *See Spin Master*, 463 F. Supp. 3d at 377.

Similarly, the language enjoining Third-Party Service Providers from "providing services to Defendant" is overly broad.  The proposed injunction poses "unnecessary burdens on lawful activity" because it would bar Third-Party Service Providers from providing services to

Defendant even if Defendant was engaging in non-infringing marketing or sales. *Starter Corp.*, 170 F.3d at 299. Thus, the Court will revise the language "providing services to Defendant" to "providing services to Defendant in connection with the continued operation of Defendant's Website" as authorized at the Preliminary Injunction stage.

### E. Transfer of Defendant's Infringing Domain Name

The ACPA permits the Court to "order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C). Thus, the Court may order that Defendant immediately transfer their infringing domain names to Plaintiff. *See Mattel, Inc. v. www.happy-toys.shop*, 2022 WL 814310 (S.D.N.Y. Mar. 17, 2022); *Spear, Leeds & Kellogg v. Cent. Life Assur. Co.*, 85 F.3d 21, 22 (2d Cir. 1996). The transfer of a domain name is particularly appropriate if the defendant has expressed a willingness to continue to use the infringing domain name. *See Ideavillage Prod. Corp. v. Liuzhou Weimao Mobile Accessory Co.*, 2021 WL 3621788, at *7 (S.D.N.Y. Aug. 16, 2021). Because Defendant used Plaintiff's protected mark in its domain name to facilitate the sale of counterfeit goods, and Defendant is likely to continue using the infringing domain name absent injunctive relief, the transfer of the domain name to Plaintiff is appropriate and is granted.

### F. Service of Asset Restraining Notice

To satisfy its statutory damage award, Plaintiff seeks to serve asset restraining notices upon Defendant, Third-Party Service Providers, and Financial Institutions after the Court enters final judgment. Plaintiff asserts that post-judgment relief is available under Federal Rule of Civil Procedure 69 and state law, specifically Section 5225 of the New York Civil Practice Law and Rules. Plaintiff asserts that it will move for an asset transfer order "upon restraint" and does not appear at this stage to be requesting an asset transfer order.

Federal Rule of Civil Procedure 69(a)(1) states that "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgments or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." The applicable "procedure of the state where the court is located" is described in Sections 5222 and 5225 of the New York Civil Practice Law and Rules. Section 5222 permits a judgment creditor to serve a restraining notice on a person who holds property belonging to the judgment debtor in order to prevent that person from transferring the property. *See Spin Master*, 463 F. Supp. 3d at 384. Section 5225 then authorizes the commencement of a special proceeding or motion practice against the person in possession of that property that may ultimately result in the transfer of the property after finding personal jurisdiction over the garnishee and a hearing. *Id*. at 384. Pursuant to Section 5222, the Court grants the post-judgment asset restraint and orders that Defendant is "forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property" in which they have an interest, "except as set forth in subdivisions (h) and (i) of this section." N.Y. C.P.L.R. § 5222(b).

Thus, although Plaintiff does not seek an asset transfer at this time, the Court notes that orders issued under Section 5225 "are not to be directed toward a defendant's frozen assets generally, but rather to specific pieces of property." *Mattel, Inc. v. 1622758984*, 2020 WL 2832812, at *8. Courts in this District have denied plaintiffs' Section 5225 motions without prejudice when plaintiffs fail to identify the particular property as to which they seek a turnover. *See Bernard v. Lombardo*, 2016 WL 7377240, at *3 (S.D.N.Y. Nov. 23, 2016); *WowWee Grp. Ltd. v. Meirly*, 2020 WL 70489, at *3 (S.D.N.Y. Jan. 7, 2020). Plaintiff thus will have to specify pieces of property to satisfy its statutory damage award should it move for an asset transfer order.

### G.     Dissolution of Rule 62(a) Stay

Federal Rule of Civil Procedure 62 stays the execution and enforcement of judgments for thirty days.  Plaintiff requests a continuance of the pre-judgment asset restraint because the automatic stay and absence of interim asset restraint provide Defendant a thirty-day window to conceal and dissipate its assets.  Dkt. No. 28.  The Court may address these concerns by ordering immediate enforcement of the judgment pursuant to Federal Rule of Civil Procedure 62(a).  *See* Fed. R. Civ. P. 62, Advisory Committee's Notes (2018) ("Amended Rule 62(a) expressly recognizes the court's authority to dissolve the automatic stay or supersede it by a court-ordered stay.  One reason for dissolving the automatic stay may be a risk that the judgment debtor's assets will be dissipated.").  As a result, the Court dissolves the automatic stay imposed by Federal Rule of Civil Procedure 62 and allows for the immediate enforcement of the judgment.

## CONCLUSION

The motion for default judgment is GRANTED.

The motion for a permanent injunction is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. No. 28 and to close the case.


SO ORDERED.

Dated: July 18, 2022
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge